FORT LEE SAVINGS & LOAN ASSOCIATION, A NEW JERSEY CORPORATION, PLAINTIFF, v. JOSEPH R. LIBUTTI, a/k/a JOSEPH R. LIBUTTI, JR. AND JOANNE LIBUTTI, a/k/a JOAN LIBUTTI, HIS WIFE, DEFENDANTS, AND MITCHELL, HUTCHINS & CO., INC., A DELAWARE CORPORATION, DEFENDANT-APPELLANT, AND JOSEPH LIBUTTI AND EDITH LIBUTTI, HIS WIFE, JOSEPH DESIERVO AND VIOLA DESIERVO, HIS WIFE, PEOPLES TRUST CO. OF BERGEN COUNTY, A CORPORATION OF NEW JERSEY, HORIZON HOUSE MANAGEMENT CORP., A NEW JERSEY CORPORATION, AND ALLEN CARPET SHOPS, INCORPORATED, A NEW JERSEY CORPORATION, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 26, 1969—Decided June 30, 1969.

Carton, J., dissented.

Before Judges GOLDMANN, KOLOVSKY and CARTON.

*Mr. Richard B. Goldsmith* argued the cause for appellant (*Messrs. Williams, Gardner, Caliri, Miller & Otley,* attorneys).

Respondents did not file a brief.

PER CURIAM. On December 3, 1964 defendants Joseph R. LiButti and Joanne LiButti, husband and wife, executed a purchase money bond and mortgage to secure a loan of

$42,000 at 6%. They defaulted in installment payments and, following a foreclosure judgment entered July 17, 1967, the property was ordered sold. The sale resulted in a surplus of $18,440.12, which was deposited with the court.

The LiButtis were tenants by the entirety of the property in question. Defendant Mitchell, Hutchins & Co., Inc., had recovered a judgment on April 27, 1964 in the amount of $5,570.49 and costs against Joseph LiButti — this prior to the execution of the bond and mortgage mentioned. Mitchell, Hutchins applied to the court for payment of its judgment out of the surplus. That application was eventually denied on the basis of *Servis v. Dorn,* 76 *N. J. Eq.* 241 (*Ch.* 1909), and the decision of this court in *Dorf v. Tuscarora Pipe Line Co., Ltd.,* 48 *N. J. Super.* 26 (1957) (*dictum,* at *page* 32).

In *Servis* Vice-Chancellor (later Chancellor) Walker held (76 *N. J. Eq.,* at *page* 243) that surplus money arising from a foreclosure sale of real property held by the entirety "stands in the place of the land itself in respect to liens thereon or vested rights therein." The holding of that case has withstood the test of time. See *Morris v. Glaser,* 106 *N. J. Eq.* 585, 592 (*Ch.* 1930), affirmed o.b. 110 *N. J. Eq.* 661 (*E. & A.* 1932); *Vineland S. & L. Ass'n v. Felmey,* 12 *N. J. Super.* 384, 392 (*Ch. Div.* 1951); *Danes v. Smith,* 30 *N. J. Super.* 292, 301–302 (*App. Div.* 1954). See also, 4 *Pomeroy, Equity Jurisprudence* (*5th ed.* 1941), § 1167, *p.* 495; 7 *N. J. Practice* (*Clapp, Wills and Administration*) (*3d ed.* 1962), § 1781, *p.* 521, and Annotation, "Estate by entirety in personal property," 64 *A. L. R. 2d* 8, 60 (1959).

We agree with the Chancery Division judge that Mitchell, Hutchins is not presently entitled to satisfaction of its judgment out of the principal of the surplus monies. The principal will be held under the control of the court to await severance of the estate by the death of Joseph or Joanne LiButti, "when it will or will not become available * * * accordingly as the judgment debtor [Joseph] sur-

vives or dies before the other tenant by entirety [Joanne]."
*Servis v. Dorn,* above, 76 *N. J. Eq.,* at *page* 245.

Affirmed.

CARTON, J. A. D. (dissenting). For an indefinite period,
possibly stretching into the distant future, the challenged
order removes from the reach of the judgment creditor the
husband's share of that fund which in justice ought to be
applied against his valid indebtedness. Inasmuch as the
ultimate ownership of the proceeds of sale is made to depend
upon the hazard of survivorship inherent in tenancies by
the entirety, that order compounds the injustice by making
any expectation of recovery highly fanciful. It establishes
an exception to the salutary rule that tenancies by the
entirety may not exist in personal property and by means
of a fiction extends in new form a type of tenancy whose
values has been widely questioned even so far as it applies to
real property. Furthermore, it imposes upon the court sys-
tem an unwarranted burden of administering the funds and
supervising their investment until such time as one of the
spouses dies.[1]

At the time of the foreclosure of the mortgage resulting
in the $18,000 "surplus," the LiButti property was encum-
bered by other mortgages totaling $48,000 and by four other
judgment liens in the amount of $8,000. The existence of

---

[1] Of the slightly less than $25,000,000 paid into court pursuant to
*N. J. S.* 2A:15–73, 74 and maintained in trust funds, the great bulk
represents the proceeds of various condemnation proceedings in some
4,000 separate accounts. About $2,000,000 is distributed among 1700
additional accounts maintained under a general trust category, and
the remainder of about $500,000 in about 200 accounts representing
funds held in connection with liquidations of building and loan as-
sociations. The exact amount deposited and kept in trust funds
representing surplus monies from foreclosures and the number of
accounts required to be administered in connection with such funds
cannot readily be ascertained from available statistics. However, it
seems safe to assume the amount of money and the number of ac-
counts of this nature to be more than nominal even in these pros-
perous times when relatively few mortgage foreclosures occur.

this imposing lien indebtedness against the property eliminated for all practical purposes any reversionary interest either the husband or wife may have had in that surplus. These circumstances underscore the inherent injustice and the utter unreality of the entry of an order which consigns the funds to the legal and economic limbo of "await(ing) the severance of the estate [by the entirety] by the death of Joseph and Joan C. LiButti."

The majority has concluded that the doctrine of *stare decisis* compels this result. In doing so it adverts to the pronouncement of Vice-Chancellor Walker in *Servis v. Dorn*, 76 *N. J. Eq.* 241 (*Ch. Div.* 1909), that surplus money arising from a foreclosure sale of real property held by the entirety "stands in the place of the land itself in respect to liens upon or vested rights therein."

The philosophy behind this general statement, as it applies to a variety of situations where real property has been converted to personalty, is set forth in *Morris v. Glaser*, 106 *N. J. Eq.* 585 (*Ch. Div.* 1930), affirmed o.b. 110 *N. J. Eq.* 661 (*E. & A.* 1932):

"* * * The proceeds retain the character of real estate for the purposes of succession. *Oberly v. Lerch*, 18 *N. J. Eq.* 346. The theory upon which such surplus proceeds are held to be land is that the surplus usually arises because more land is sold than is necessary, in one case, to pay the debts of decedent; in another (foreclosure), than is necessary to satisfy the mortgage debt; and in partition, because the land is impossible of division and for practical purposes it has been converted into money. But in each case the money stands for the land and the rights therein are determined as though the court were dealing with the land itself. Upon an application for distribution of such surplus moneys, the division amongst those entitled is, in effect, an equitable partition of the land for which the money stands. The excess, though in the form of money, remains, as before, impressed with the character of the land. *Cooke v. Dealey*, 22 *Beav.* 196. Such money passes by succession on 'the principle that money impressed with the character of land remains such until it is accepted as money by its *absolute owner* of sufficient capacity to make such election.' *Oberly v. Lerch, supra.* * * *" (at *pp.* 592–593)

The generality that the surplus money stands in the place of the land itself, although acceptable as a general

proposition, does not provide a valid foundation for the conclusion reached in *Servis*.

Granted that surplus monies may in a sense be said to stand in the place, that is, replace the real property. Granted too that there is a valid reason for making a distribution of the surplus as between the former owners on the basis of their respective rights in the real property as they existed at the time their interests in the real property ceased and for preserving the order of priorities of the creditors who obtained liens on the property.

A far different thing it is to say that the proceeds of the mortgage foreclosure sale are for all purposes to be treated as real property and cannot be distributed and must be held in abeyance out of the reach of creditors until the marriage terminates. Such a conclusion rests upon the pure fiction that somehow the tenancy by the entirety which exists in the real property is born anew and becomes infused into the proceeds of sale and that that unique status, with all its ancient incidents, abides in the proceeds for the indefinite future.

The estate by the entirety has been described as a "remnant of other times" which rests upon the "fiction of a oneness of husband and wife." See dissenting opinion of Chief Justice Weintraub in *King v. Greene*, 30 *N. J.* 395, 413 (1959). The social purpose of the tenancy by the entirety seems to be to solidify the marital status by encouraging and protecting home ownership and to protect and insulate the institution of marriage from the onslaught of creditors. Upon death of one of the spouses, it assures the survivor, normally the wife, possession of a home free and clear of the individual indebtedness of the other.

But whatever social purpose this tenancy was designed to serve in the interest of married parties and whatever the reasons for its continued existence in this State, there is no justifiable basis for extending it to the personal property which replaces it. To indulge in the further fiction necessary to achieve such a result serves no useful purpose and acts to

frustrate justice. Furthermore, it runs counter to the policy of this State against recognizing the existence of tenancies by the entirety in personalty. *Central Trust Co. v. Street,* 95 *N. J. Eq.* 278 (*E. & A.* 1923); *Brown v. Havens,* 17 *N. J. Super.* 235, 238 (*Ch. Div.* 1952). See Annotation, "Estates by entirety in personal property," 64 *A. L. R. 2d* 8, 31 (1959).

Nor can such a doctrine be justified on the theory that the survivorship rights of husband and wife continue because the surplus monies are the product of an involuntary conversion and thus become a substituted *res* standing in place of the property. This aspect of equitable conversion also has its genesis in the general concept that the proceeds of the sale stand in the place of the real property and that the property, although in fact converted into personalty, must be treated as not converted. See 4 *Pomeroy, Equity Jurisprudence* (*5th ed.* 1941), § 1167, *p.* 495, where the author more aptly describes this type of conversion as "conversion by paramount authority." This doctrine has been applied to the distribution of the proceeds of condemnation proceedings. *Dvorken v. Barrett,* 100 *N. J. Super.* 306 (*App. Div.* 1968), affirmed o.b. 53 *N. J.* 20 (1968).

But it can have no logical application to a mortgage foreclosure. Mortgagors, in executing mortgages, must certainly be held to have understood both that they must pay the amount which the mortgage secures and that their interest in the property may be cut off by foreclosure and sale of the property in the event of a default. The foreclosure and sale are steps in a process entirely consensual in its origin and nature. Compare *Dorf v. Tuscarora Pipe Line Co., Ltd.,* 48 *N. J. Super.* 26 (*App. Div.* 1957).

A trend toward distinguishing the involuntary conversion cases evidenced in this State in *Dorf* has proceeded much further in the courts of New York. In *Hawthorne v. Hawthorne,* 13 *N. Y. 2d* 82, 242 *N. Y. S. 2d* 50, 192 *N. E. 2d* 20 (*Ct. of App.* 1963), the court limited the involuntary conversion theory to condemnation proceedings and found

that the proceeds of a fire insurance policy on realty held by the entirety was a voluntary conversion and therefore severable as jointly held personal property. Although recognizing the loss as one resulting from accidental causes and therefore involuntary, it held that the money existed only as the result of entering into a personal contract of insurance and did not arise as a matter of law. The court cited with approval *Franklin Square Nat. Bank v. Schiller*, 202 *Misc.* 576, 119 *N. Y. S. 2d* 291 (*Sup. Ct.* 1950), which held that after a foreclosure sale of property held by the entirety the proceeds were payable in equal shares to the husband and wife as tenants in common. By way of *dictum*, in *Hawthorne* the court stated that the proceeds of a foreclosure of real property held by the entirety would be treated as personalty. The court commented:

"Putting aside the change in the use of realty, it is incontrovertible that a decision that ties up money, allowing only division of interest, is a serious impediment to its enjoyment." (242 *N. Y. S. 2d*, at p. 53, 192 *N. E. 2d*, at *p.* 22).

The validity of *Servis* was questioned recently in *In re Ved Elva, Inc.*, 260 *F. Supp.* 978 (*N. J. D. C.* 1966). The court held that the sale of property by a trustee as an asset of the bankrupt husband and wife destroyed the right of survivorship in the debtor-husband which the petitioner-creditor could have sold before the fee title vested in the trustee. It rejected the petitioner's claim that his judgment lien, obtained prior to the bankruptcy, was transferred to the proceeds of sale, and refused to follow the doctrine stated in *Servis*, commenting:

"Since *King v. Greene, supra*, a half century *after Servis*, when tenancy by the entirety in New Jersey received a new and full analysis, it is improbable that ancient incidences and equitable fiction as imposed in *Servis* would be so extended." (at *pp.* 982–983)

Keeton, in describing the function of the judiciary in maintaining a proper balance in the law between the need

for stability and continuity and flexibility to meet conditions, says:

"The judiciary is, then, on the one hand a guardian of the law's continuity, stability, evenhandedness, and predictability and on the other hand a participant in creative evolution that keeps laws contemporary and viable." Robert E. Keeton, "Venturing to do Justice" (1969).

This obligation of the judiciary has often been recognized by the courts of this State. The basic principles were restated by Justice Jacobs in *Schipper v. Levitt & Sons, Inc.*, 44 *N. J.* 70 (1965):

"The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law principles abreast of the times." (at *p.* 90)

A doctrine which renders surplus monies in foreclosure proceedings against property owned by the entirety immune from the claims of the individual spouse until the marriage ends is out of step with the times. It ignores the modern economic life about us. Contrary as it is to ordinary concepts of justice and founded as it is on legal fiction, it should be discarded as a reproach to our judicial system. We must not "reverence gray-headed doctrines; though feeble, decrepit and within a step of dust, and on this account maintain opinions which have nothing but our charity to uphold them." Joseph Glanvill, "The Vanity of Dogmatizing" (1661).

The following comment of Justice Holmes is singularly pertinent to the situation before us:

"It is revolting to have no better reason for a rule of law than that it was laid down in a time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Holmes, "Path of the Law," 10 *Harv. L. Rev.* 467, 469 (1897).

Accordingly, I would reverse the order entered in the Chancery Division.